UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| BRENDA M. CHRISTY, | ) | Civil Action No.: 4:09-cv-1428-JMC-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| THE CITY OF MYRTLE BEACH and | ) | |
| THE MYRTLE BEACH POLICE DEP'T, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

In this employment action, Plaintiff alleges gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. and age discrimination and retaliation in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq. Presently before the Court is Defendants' Motion for Summary Judgment (Document # 40). Plaintiff filed a Response (Document # 45) in opposition to the Motion, to which Defendant filed a Reply (Document # 51). The matter is ripe for disposition. All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

## II.    FACTS

### A.    Plaintiff's Movement Through the Ranks with the Myrtle Beach Police Department

Plaintiff was hired by Defendant Myrtle Beach Police Department (MBPD) as a patrol officer on November 11, 1987. Warren Gall Affidavit ¶ 2 (attached as an Exhibit to Defendants' Motion). In 1990, she was promoted to Patrol Officer First Class. Id. On September 18, 1996, Plaintiff was promoted to Corporal. Id. at ¶ 15. Current Chief of Police for the MBPD, Warren Gall, was a

Captain at the time of Plaintiff's 1996 promotion and was in Plaintiff's direct chain of command. Id. at ¶¶ 7, 15. As such, he offered his input to the Police Chief regarding Plaintiff's promotion to Corporal and indicated that he felt she had potential. Id. at ¶ 15. Gall was promoted to Chief of Police on April 1, 1997. Id. at ¶ 16. On October 8, 1999, Gall promoted Plaintiff to Investigator. Id. at ¶ 21.

### B.    Plaintiff's Educational Achievements while with the MBPD[1]

In 1988, Plaintiff graduated from the South Carolina Criminal Justice Academy. Plaintiff Resume. In 1993, she earned an Associate Degree in Criminal Justice from Horry-Georgetown Technical College. Id. In 1994, Plaintiff was a nominee for Rotary Club Police Officer of the Year and in 1995, she was selected as the Rotary Club Police Officer of the Year. In 2000, shortly after Chief Gall promoted Plaintiff to Investigator, he selected her to attend the Administrative Officer's Management Program (AOMP) at North Carolina State University in Raleigh, North Carolina. Gall Aff. ¶ 23. Plaintiff was the first officer Gall selected to attend this course. Id. The City paid her salary, tuition, room and board, and provided her a City vehicle while she attended the 12-week full time management-oriented training program to improve her leadership and management skills. Id. Plaintiff earned a certification through the AOMP and received credits applicable towards her subsequent master's degree. Id. In 2006, Plaintiff earned a Master's Degree in Human Resources Development from Webster University, which the City also financially supported. Plaintiff's Resume; Gall Aff. ¶ 23. Plaintiff was honored as the Outstanding Graduate of the Year for 2006 by Webter University and delivered the graduation speech as Valedictorian. Plaintiff Aff. ¶ 32.

---

[1]Prior to her employment with the MBPD, Plaintiff earned a Bachelor of Arts degree in Physical Education and Oral Communications from Fairmont State College in Fairmont, West Virginia. Plaintiff Resume (attached as an Exhibit to Plaintiff's Response).

## C.    Plaintiff's Early Disciplinary Actions and Performance Appraisals

In 1993, Plaintiff was disciplined for being out of uniform while on duty and assigned to patrol the former Myrtle Beach Air Force Base.  Gall Aff. ¶ 5; MB1-001578 -1579 (attached as Exhibit 5 to Thomas Affidavit).[2]  In Plaintiff's October 1993 Personnel Appraisal Form, Lieutenant Holder commented that "Officer Christy has a slight problem and that is her attitude. She doesn't seem satisfied with anything in this department and voices it to the other officers which creates animosity."  Id. at ¶ 6; MB1-000693.  On November 21, 1993, Plaintiff took a patrol car to a former officer's funeral in the Columbia area without permission.  Id. at ¶ 7.  Plaintiff was off-duty at the time.  Id.  The patrol car broke down before Plaintiff arrived at the funeral and had to be towed.  Id.  At Gall's instruction[3], Lieutenant Burns counseled Plaintiff for poor judgment, poor attitude and contempt for authority due to the manner in which she handled the situation.[4]  Id.; MB1-001580 - 1581.  Lt. Burns noted that he could "find no actual policy violated committed by" Plaintiff or that she had committed any abuse or neglect of the vehicle.  Plaintiff Aff. ¶ 8; MB1-001582.

In May of 1994, Plaintiff was counseled for using inappropriate language towards a dispatcher on the police radio when the dispatcher inquired about her location.  Gall Aff. ¶ 8; MB1-001585.  In June of 1994, then-Chief Killman suspended Plaintiff for one day without pay and ordered supervisory counseling following a verbal altercation and her use of profanity towards

---

[2]Unless otherwise noted, all documents with bates-stamped numbers MB1-00016 - 001744 are attached as Exhibit 5, City Documents, to the Thomas Affidavit.

[3]Gall was Plaintiff's Captain at this time.  Gall Aff. ¶ 7.

[4]In a memo to Lieutenant Burns, Gall commented that Plaintiff "displays an obvious contempt for authority," based on her written comments in her special report outlining her involvement in the incident.  Id.  In her written statement, Plaintiff questioned whether this would have even been an issue if the car had not broken down, and she commented that she was embarrassed to arrive late for the funeral because the car broke down.  Id.  Gall viewed Plaintiff's comments as a refusal to acknowledge that she had done anything wrong.  Id.

Lieutenant Cheatwood of the Myrtle Beach Fire Department. Gall Aff. ¶ 9. When her supervisors addressed the issues with her and presented her with the documentation for her to sign acknowledging receipt of the corrective/disciplinary action, Plaintiff refused to sign. Id. Chief Killman gave Plaintiff a direct order to sign the document, and she signed it. Id.; MB1-001586. In Plaintiff's August 1994 Performance Appraisal, she received low scores in the categories of "Ability to get along with co-workers, supervisors, and the public" and "Compliance with instructions, rules and regulations." Gall Aff. ¶ 10; MB1-000675.

Plaintiff's Performance Appraisal for August of 1995 indicated improvement in her judgment, attitude and ability to get along with others. Gall Aff. ¶ 12. As her Captain, Gall commented that Plaintiff "has shown genuine enthusiasm for her new assignment as a bicycle officer, and is displaying the appropriate supervisory skills when called upon to do so. I expect great things from her. She has turned herself around 180 degrees (as I always knew she could) and she is a top performer and should challenge for the available supervisory positions (Corporal) coming up. Her attitude and professionalism is an example for others to follow." Id.; MB1-000674, -1645.

In May and June of 1996, Plaintiff engaged in unprofessional conduct during and following an off-duty incident with a South Carolina Highway Patrol trooper who issued her a traffic ticket for running a stop sign. Gall Aff. ¶ 13. The video/audio of the stop showed Plaintiff using profanity towards the trooper. Id. In addition, when she contested the ticket in traffic court, she wore her police uniform, which was a violation of Department policy. Id. As her Captain, Gall issued Plaintiff an oral reprimand in June of 1996 for her unprofessional conduct. Id.; MB1-001587 - 1590. In her Performance Appraisal for August of 1996, Plaintiff's supervisor, Sergeant Faith Gildea, noted the June 1996 oral reprimand, and the need for Plaintiff to think of a future beyond the Bicycle Patrol, but otherwise made very positive comments on Plaintiff's performance, with which

Lieutenant J. V. Ward concurred.  Gall Aff. ¶ 14; MB1-001646 - 1662.

In August of 1997, then-Captain Faith Gildea noted that Plaintiff "sometimes allows emotion to intervene in her decisions relating to her subordinates."  Gall Aff. ¶ 17; MB1-000646 - 648; MB1-001674 - 1676.  However, Gildea also commented that she believed Plaintiff would continue to grow as she became more comfortable with her supervisory position.  Id.

In Plaintiff's Performance Appraisal for 1998, John Kennedy, who had supervised Plaintiff in the Patrol Division, noted that she "sometimes could be abrasive with her fellow employees." Gall Aff. ¶ 19;  MB1-000627.  With respect to Plaintiff's supervisory skills, Kennedy noted that she "needs to work at gaining her subordinates' trust and respect. Christy sets high expectations and sometimes she over emphasizes small problems. . . . Cpl. Christy needs to see that there is more than one way to get a job done."  Id.  Lieutenant Frank Daniels, who supervised Plaintiff in Narcotics, gave her high marks, including her supervisory skills, and positive comments. MB1-001682 - 1697.

In Plaintiff's Performance Appraisal for the year ending August 1999, Lt. Daniels again gave her high marks, including her supervisory skills, with positive comments.  MB1-001711 -1728.

In August of 2000, Plaintiff received generally good ratings on her Performance Appraisal, but Sergeant John King noted some weaknesses.  Gall Aff. ¶ 24.  King stated, "There is still room for improvement when it comes to fellow workers and her people skills. These things have been addressed with Detective Christy and it is hopeful that she will improve in her shortcomings."  MB1-000603, -1741.  "She realizes that in order to get to this next level that she needs to do some fine tuning on her people skills. This has been discussed with Detective Christy and she is working very hard to succeed at this task." MB1-000605, -1743.  King set as a goal for Plaintiff for the next rating period for her to "improve her people skills and enhance her leadership style. This can be accomplished by assisting the Uniform Division as well as the Investigative Division and by being

more mindful of how she expresses herself to others." MB1-000596, -1731.

In Plaintiff's next Performance Appraisal in August of 2001, King wrote, "There is room for improvement when it comes to getting along with her co-workers. Brenda's rating in this area is lower this year compared to last year." MB1-000581. King also commented that "There were a couple of occasions this year in which Brenda was not completely forthcoming with some information that I was questioning her on. I have spoken with Brenda on this issue and am confident that such incidents will not be repeated in the future." MB1-000582. Plaintiff disagreed with her 2001 Performance Appraisal and appealed to Gall to revise it. Gall Aff. ¶ 27. Gall declined to change the ratings on her Appraisal. Id.

On January 24, 2002, Plaintiff was at a Garden City bar (outside the jurisdiction of the City of Myrtle Beach) where she attempted to interview an uncooperative suspect, and then issued the woman a summons ticket for Disorderly Conduct (Public Intoxication) under the purported jurisdiction of the Myrtle Beach Municipal Court, and had an Horry County officer transport the woman to the Myrtle Beach Jail. Gall Aff. ¶ 28. The next day, Lieutenant Kennedy confronted Plaintiff about her unlawful arrest of the suspect outside of the jurisdiction of the City of Myrtle Beach, and instructed her to straighten out the situation immediately. Id. Plaintiff failed to comply with his directive. Id. On February 4, 2002, Sergeant Chestnut met with Plaintiff and orally reprimanded her. Id.

### D.    2002 Sexual Harassment Complaint

Immediately after her oral reprimand on February 4, 2002, Plaintiff attempted to assist a female co-worker, Deborah McCorkle, who told her that she had been sexually harassed by a male co-worker, Terry Altman. Plaintiff Aff. ¶17; Gall Aff. ¶ 29. In response, Police Chief Warren Gall ordered Plaintiff's, McCorkle's and Altman's immediate supervisors to conduct an investigation. Plaintiff

asserts that normally, such an investigation would be conducted by a more neutral body, the Office of Professional Standards-Internal Affairs Division.  Id.  However, Captain Faith Gildea, Administrative Captain since 2000, avers that it is normal to have allegations regarding workplace conduct investigated by one's chain of command, rather than by the Internal Affairs Division.  Gildea Reply Aff. ¶ 11.  Nothing in the City's policies or the Department's policies requires an investigation by the Internal Affairs Division.  Id.  Captain Gildea is unaware of any sexual-harassment type allegation investigated by the Internal Affairs Division.  Id.   In any event, Plaintiff avers that McCorkle later recanted her allegation.  Plaintiff Aff. ¶ 19.  Defendants dispute that McCorkle ever recanted any statements she made during the 2002 investigation and assert that Plaintiff could not have known what McCorkle said during the confidential investigation.  McCorkle testified Altman's conduct, including "up and down eyes" and "gyrating,"did make her feel uncomfortable but she did not ask for Plaintiff's help and wanted to handle it on her own.  McCorkle Dep. pp. 129-141.  McCorkle talked with Altman, he apologized and "nothing else has transpired."  Id. at p. 135.  Following the investigation, Plaintiff was suspended for two days without pay for conduct discovered during the investigation.[5]  Plaintiff Aff. ¶ 19.

Shortly after Plaintiff made the report of sexual harassment, she discovered that Altman had a group photograph displayed on the wall behind his desk in public view with black tape covering Plaintiff's face.  Plaintiff Aff. ¶ 22.  Plaintiff took a photograph of the photograph and made a

---

[5]Gall avers that, during the investigation, "several officers reported that Investigator Christy often lied to them, and that they did not trust her. It also came to light that Investigator Christy had accessed and read a co-worker's email without his authorization, that she gossiped about her fellow officers, that she entered the workplace early one morning while off duty and ran a report without following protocol, and that she had on several occasions released confidential information about ongoing police investigations to a local newspaper reporter."  Gall Aff. ¶ 30.  He further states that Plaintiff's "conduct during the investigation caused several individuals involved in the investigation to discount her credibility completely."  Id.  He issued Plaintiff a written reprimand and a two-day suspension without pay "for the instances of her misconduct that came to light during the investigation."  Id. at ¶ 31; MB1-001599 - 1600.

complaint.  Id.  Gall gave Plaintiff a written reprimand for going into the detective work bay after she made the complaint.  Id.  Plaintiff avers that she does not know of any other personnel who were prohibited from going into that area.  Id.

### E.    Plaintiff's 2004 Disciplinary Action

On October 11, 2004, Plaintiff was involved in a "major verbal altercation" with a subordinate officer over a workplace matter, in which she was reported to have inappropriately yelled and lost control.  Gall Aff. ¶ 45.  It was reportedly a very disruptive episode, witnessed and overheard by other officers, and it created morale problems.  Id.  After an internal investigation, Captain Joe Vella and Lieutenant Joseph Capp issued Plaintiff a Written Reprimand which documented that Plaintiff was removed from supervisory duties, temporarily transferred to Warrants duties, and placed in a mentoring program in hopes of rehabilitating her for future supervisory duties.  Id.  Around this same time, Plaintiff approached Chief Gall and "in a very emotional manner" handed him her badge and stated that she was resigning over all the pressure.  Id. at ¶ 45.  Chief Gall discussed her situation with her and asked her to reconsider her resignation.  Id.  She subsequently withdrew her verbal request to resign.  Id.

Sergeant Marty Brown was assigned to mentor Plaintiff to help rehabilitate her for future supervisory duties.  Id. at ¶ 47.  During the mentoring process, Plaintiff indicated her fear that she was being set up for failure and that, as soon as she was placed back in a supervisory position, she would be fired after the first problem arises.  Brown Notes, 1-13-05 through 2-25-05, MB1-000359 - 362. She frequently stated that she was not ready for supervisory duties and wanted to remain in warrants for a year or so to regain her confidence and work on her supervisory skills through Webster University.  Id.  Brown's last notes in the record state: "I am not sure what [Plaintiff] really wants from the PD.  It is clear for [sic] her behavior and her comments that she does not want to be in a supervisory position."  Id.

### F.     2006 Sergeant Promotional Process

In April 2006, Plaintiff submitted an application to compete in the 2006 Sergeant Promotions Process.  Gall Aff. ¶ 53.  Pursuant to the Promotional Process Policy, Sergeant Prock and Lieutenant McCorkle each submitted a Performance Potential Rating Form (PPRF).  Id.; Performance Potential Rating Form, MB1-000260 - 264.  Their ratings of Plaintiff's performance potential (68 out of 80, and 66 out of 80, respectively) were the lowest among those received on the other candidates for the position.  Id.  Lieutenant McCorkle's PPRF referenced a recent conflict between Plaintiff and another officer.  Id.  The Promotional Panel's notes from Plaintiff's oral interview indicate she acknowledged that officers had previously been afraid of her in 2004, and that she was worried about stepping out as a Sergeant.   Gall Aff. ¶ 53; Interview Notes, MB1-000299  - 308, 312 - 15, 319 - 323.  Nevertheless, Plaintiff interviewed well.  Id.  Lieutenant McCorkle, who was a member of the Promotional Panel that interviewed the candidates, noted that Plaintiff scored well in the interview, but "in reality -- needs a chance to prove herself now before promotion." Interview Notes, MB1-000304.

There were five eligible candidates in the 2006 sergeant promotional eligibility pool from which Chief Gall would select individuals for promotion to Sergeant when positions became available during the next year.  Gall Aff. ¶ 54. The candidates in addition to Plaintiff were Investigator John Bertang, Investigator Eric DiLorenzo, Investigator Tony Allen, and PFC Rick Beatty.  Id.  Using a ratings sheet prepared by Captain Gildea from the documentation from the promotional process, Ratings Sheet, MB1-000017, Chief Gall prepared a worksheet comparison of the candidates based on those ratings and a variety of other factors.  Gall Aff. ¶ 54; Worksheet, MB1-000016.  All of the candidates met the minimum qualifications for eligibility as described in the Promotional Process

Policy.[6]  Gall Aff. ¶ 54.  All had received equally good performance evaluation scores and commendations, but Plaintiff had the worst disciplinary record.  Id. Investigators Bertang and DiLorenzo had received the highest PPRF ratings from their supervisors, followed by PFC Beatty, then Investigator Tony Allen, with Plaintiff rated last.  Id.  However, Plaintiff had worked more years with the Department, and she and Investigator Bertang had both completed the AOMP and post-graduate degrees.  Id.  Based on such semi-objective factors, Chief Gall ranked the eligibility pool as follows: (1) Bertang, (2) Plaintiff, (3) DiLorenzo, (4) Allen, and (5) Beatty, and posted the ranking in a memorandum dated May 15, 2006, explaining that the promotional eligibility pool would be used for any vacancies in the rank of Sergeant for the remainder of 2006 and up until April 22, 2007.  Id.

According to Chief Gall, pursuant to the Promotional Process Policy, he has the discretion to promote any of the "current top three candidates for a vacant position."  Gall Aff. ¶ 16.  Plaintiff argues that Chief Gall misquotes the Promotional Process Policy, which provides that "[t]he Chief of Police may choose any of the top three candidates for a vacant position."  Gall Dep. Ex. 11, MB1-001544. Chief Gall added the word "current" to the sentence in his affidavit.  This distinction becomes important with regard to the third promotional opportunity that arose in March of 2007 and will be discussed further below.

In July of 2006, a Sergeant position became available and Chief Gall selected Investigator John Bertang, the first ranked candidate in the list, to fill it.[7]  Gall Aff. ¶ 55.  Another Sergeant position became available in December of 2006.  Id. at ¶ 60.  The remaining top three candidates in the

_____

[6]The eligibility requirements were six years of service with the Myrtle Beach Police Department as a certified officer with two years as a Police Investigator before the position closing; a minimum of thirty-six hours towards Associate or Bachelors Degree or sixty-eight CEUs in works related classes, schools and seminars; maximum of one preventable accident in the year prior to the announcement date; no written reprimand or suspension from duty in the year prior to the announcement date.  See Promotional Process Announcement, P-121 (attached as an Exhibit to Plaintiff Affidavit).

[7]This promotion is not at issue in this action.

eligibility pool were Plaintiff, DiLorenzo and Allen. Chief Gall filled with position Eric DiLorenzo, a male, younger than Plaintiff, due to the totality of his demonstrated skills. Id. Investigator DiLorenzo had never been a supervisor. Gall Dep. p. 60. Lorenzo stated in his promotional interview that, "I don't have formal supervisory experience . . . I have not been in a patrol car in 7 years." Gall Dep. Ex. 4, MB1-000198 - 200. However, of great significance to Chief Gall were the PPRF comments of his first and second level supervisors, Lieutenant Joseph Capp and Sergeant Terry Altman, who both rated Investigator DiLorenzo the highest possible scores in every category (80 points out of a possible 80). Gall Aff. ¶ 60. Among the comments by DiLorenzo's supervisors were that he was an effective communicator, was articulate, and was a natural leader, but never condescending despite his education and intelligence. Id. DiLorenzo was also well respected by his peers and was able to accept constructive criticism. Id. at ¶¶ 60-61.

Plaintiff's August 2006 Performance Appraisal was the last performance evaluation she received prior to the July of 2006 promotion that was given to DiLorenzo. Plaintiff Aff. ¶ 32. She received mostly positive comments from her supervisor, Sergeant Prock, and others. However, Sergeant Prock documented that Plaintiff continued to have problems with her ability to get along with coworkers and supervisors. Gall Aff. ¶ 57; MB1-000478 - 479. Lieutenant McCorkle stated in the same Performance Appraisal, "[t]o be promoted to a higher position of authority and span of control of officers, it will take time to reestablish her abilities to supervise." MB1-000487. In addition, between May of 2006, when the eligibility pool was first posted, and December of 2006, Plaintiff received a June 2006 oral reprimand for failing to handcuff a subject arrested for assault in violation of the Department's regulations and an August 2006 oral reprimand for leaving a prisoner sitting on a bench uncuffed in open area of the jail. Gall Aff. ¶¶ 56, 58.

In late fall of 2006, Plaintiff informed her supervisors that she did not want to supervise others, but she wanted to be elevated to the rank of Sergeant and remain in the Warrants Division. Gall Aff.

¶ 59; Prock Aff. ¶¶ 8 - 10. The Police Department did not need a Sergeant in the Warrants Division and it was Chief Gall's policy that every officer ranked Corporal and above must be capable of effectively handling supervisory assignments in addition to other work assignments.[8] Gall Aff. ¶¶ 52, 59. In November of 2006, because Plaintiff continued to state that she desired the Sergeant promotion, and she was in the promotional pool, Chief Gall and Plaintiff's supervisors decided to assign her to supervise four officers on B- Shift in the Street Crimes Unit. Gall Aff. ¶ 59; Prock Aff. ¶¶ 10, 15; McCorkle Aff. ¶ 12. Their intention was to assist and give Plaintiff the opportunity to demonstrate that she was ready to resume a supervisory role. Gall Aff. ¶ 59. Although the decision was made in November of 2006 to assign Plaintiff to supervise a shift, Plaintiff did not become active in the unit until January 2006 due to training and time off. Prock Aff. ¶ 13. Thus, when Chief Gall was making the December 2006 promotion decision, Plaintiff had not yet had the opportunity to establish that she could effectively supervise others. Gall Aff. ¶ 60.

In January 2007, two of Plaintiff's subordinates complained to Prock about her; Prock directed them back to Plaintiff to work it out per the chain of command policy. Prock Aff. ¶¶ 12-13. Around February 20, 2007, Prock spent approximately two hours discussing supervisory issues with Plaintiff regarding Plaintiff's allowance of some of the officers under her command's insubordination and some other concerns. Id. at ¶¶ 14-18. A day or so later, Plaintiff stated she had addressed the issues. Id. at ¶ 19.

Around February 26, 2007, Plaintiff's subordinates went as a group to talk to Prock regarding Plaintiff's meeting with them on February 25. Prock Aff. ¶ 20. They were very upset and said they had already tried to talk to Plaintiff, but she would not listen to them; they said she was very animated,

---

[8]Chief Gall made an exception with Plaintiff following her "major verbal altercation" with a subordinate officer for which she was removed from supervisory duties but kept her rank as Investigator. Gall Aff. ¶ 52.

raised her voice, threw her hands up in the air, and used inappropriate language.  Id. They said her

behavior was very unpredictable, i.e., one minute she was fine, then she was withdrawn and upset, then

she was upset and raising her voice.  Id.  They stated they did not feel they could trust her.  Id.

Prock reported the complaints to Lieutenant Heins, who was in the chain of command while

McCorkle was on vacation. Id. at ¶ 21.  He in turn discussed it with Chief Gall to let him know he was

looking into it. Grievance Hearing Transcript, Page 24 (attached as an Exhibit to the McGrath

Affidavit). Chief Gall stated:

> And my conversation with him, as I have in the past with Capt. Vella was, you all be
> very careful about employees, officers, subordinates ganging up and thinking that
> because they don't like something that they can run a supervisor off that they don't like
> or cause that supervisor grief. I said, you be very careful, you examine the information
> and you make a decent and, as she said, the right decision, because I will not tolerate
> allowing a group just to decide because they don't like somebody they're going to run
> them off.

Id.  Following his investigation, Heins opined the officers were 70% at fault and Plaintiff was 30% at

fault. Prock Aff. ¶ 21; Gall Aff. ¶ 67.

In March of 2007, one of Plaintiff's subordinates again complained to Prock about Plaintiff and

said he was considering requesting a transfer out of Plaintiff's unit. Prock Aff. ¶ 22.  Prock sent him

back to Plaintiff. Id.  He requested a transfer in April of 2007. Id.  Plaintiff's other subordinates

continued to complain to Prock about Plaintiff; each time, Prock instructed them to address their issues

to Plaintiff. Id. at ¶¶ 23-27.

Also in March of 2007, a third Sergeant slot opened. Gall Aff. ¶ 62.  Chief Gall considered the

top three candidates in the promotional pool, who were Plaintiff, Allen, and Beatty.  Id.  Chief Gall

selected Beatty for the promotion.  Id.  When he was making his decision, Chief Gall knew that

Plaintiff's supervisors had concerns over her ability to supervise other officers. Id. at ¶ 65.  No member

of his command staff (the four Captains) recommended promoting Plaintiff.  Id. at ¶ 66.  To the

contrary, they felt she lacked character, integrity, and credibility, she was only out for herself, she did

not respect the Department or her commanding officers, she lacked accountability for her actions, she did not have the respect of her co-workers, and with her volatile behavior and demeanor, she would create hostility. Id.; Vella Affidavit; Gildea Affidavit; Frontz Affidavit; Knipes Affidavit.

On the other hand, Captain Vella highly recommended Beatty for promotion. Gall Aff. ¶ 66. As a waterfront officer, Beatty had demonstrated leadership capabilities and potential through his knowledge of ongoing crime trends and he had formulated operational plans to combat the crime in his assigned area. Id. at ¶ 62. Beatty had also made quality arrests, and he had a handle on what was going on in his area of responsibility. Id. He had previous experience as an Investigator with the department, but he had chosen to step down and ask for a demotion due to personal/family reasons at that time. Id. Although there was some concern expressed over that issue, Chief Gall felt Beatty had addressed those issues, that he had taken to heart some earlier criticisms about his attitude, and that he had demonstrated himself as a peer leader, and that he was demonstrating that he could work at a high level of performance. Id. at ¶¶ 62, 66. All of the Captains recommended Beatty over Plaintiff and Allen. Id.

Plaintiff argues that Beatty was not eligible to compete for the rank of Sergeant due to the fact that he held the Patrolman First Class rank. Plaintiff Aff. ¶ 28. As stated above, Beatty previously served as Investigator for at least two years before requesting to step down due to personal reasons. Gall Aff. ¶ 54; Gall Dep. p. 50-52; Gildea Reply Aff. ¶¶ 15-16. It is undisputed that, prior to being promoted to Investigator, Beatty never held the rank of Corporal. Gall Dep. p. 34. Plaintiff argues that, according to the Promotional Process Policy, Beatty could not have served as an Investigator without holding the rank of Corporal because one of the pre-requisites for promotion to Investigator is a minimum of one year as a police corporal. Gall Dep. p. 49. However, Defendant notes that Beatty was promoted to Investigator in 1998. Gildea Aff. ¶ 16. Chief Gall established the Promotional Process Policy in 2001. Id.; Gall Aff. ¶ 16; Gall Dep. Ex. 11, MB1-001538. The Policy states that

it "will govern the promotion of any employee hired after the effective date of the policy." Gall Dep. Ex. 11, MB1-001538, 1544. Defendant points out that, because Beatty had previously held the rank of Investigator for at least two years, he met the minimum requirements for the Sergeant position, <u>see</u> footnote 3, and there is nothing in the policy that would require an employee who previously skipped a rank to go back to a lower rank before being promoted. Defendant also points to the Policy, which provides that the "Chief of Police may set aside the time in grade requirement whenever he considers such action to be in the best interest of the department." Gall Dep. Ex. 11, MB1-001544.

Plaintiff also argues that Chief Gall attempted to change the interpretation of the Promotional Process Policy to allow him to promote Beatty, who was initially ranked in the fifth position, over Plaintiff, who was initially ranked in the second position. As discussed above, the Policy provides that "[t]he Chief of Police may choose any of the top three candidates for a vacant position." Gall Dep. Ex. 11, MB1-001544. Plaintiff argues that once the first and third candidates, Bertang and DiLorenzo, were promoted, she, as the second candidate, was the only candidate left "of the top three candidates" available for promotion. Plaintiff argues that Chief Gall unilaterally changed the policy to allow him to choose from the "current" top three candidates so that he could "reach down" to Beatty, the fifth candidate and promote him.

Defendant points to the language in the Promotional Process Policy just above the language at issue here, which states

> The promotional process would establish an eligibility pool to provide a ready reserve of officers to fill vacancies without undue delay. The pool would be in effect for not longer than one year from the closing date for that position. A new eligibility pool may be established at any time for Corporals and above. The Chief of Police may choose any of the top three candidates for a vacant position.

Gall Dep. Ex. 11, MB1-001544. Defendants argue that from the plain language of the policy, Chief Gall does not have to promote the candidates in the order in which they are listed nor does he have to promote any of them at all; he could simply hold another promotional process to establish a new

eligibility pool. Chief Gall testified in his deposition that he has promoted other employees over ones

ranked higher in the eligibility pool even though he could not remember specific names at the time:

> Q: How often have you promoted a candidate on a list such as Plaintiff's Exhibit Eight
> over one that is listed higher in the rank order?
> A: I don't know how many times, but it has happened.
> Q: Can you remember the last time it happened just in your memory?
> A: I'd have to look at the paperwork. I know it's happened. I know ... that's a guide
> for me, as it says.
> Q: Right. Well, can you name any other time other than when Brenda Christy was
> passed over in 2007?
> A: I can't name it but I can, if the documentation's here, I can show you. But I don't
> ... I can't remember off the top of my head.
> Q: You can't name one other time right now?
> A: No.
> Q: Is it fair to say that most of the time you go straight down the list?
> A: No, it wouldn't be fair to say that.

Gall Dep. 57:8-25, 58:1-4.

In support of Chief Gall's testimony, Captain Faith Gildea, Administrative Captain since 2000,

avers that of her personal knowledge, Chief Gall has promoted several individuals in lieu of higher

ranked candidates in the eligibility pool for the positions of Corporal, Sergeant, Lieutenant and

Captain. Gildea Reply Aff. ¶ 13. "Skipped" candidates include, among others, Robert Starr, Marty

Brown, Milton Adams, Richard Shoe, and John Kennedy, all of whom are male and three of whom

are younger than Plaintiff. Id. As an example, in January of 2004, after promoting two candidates to

Sergeant, Chief Gall skipped over the next, highest-ranked candidate (a male, initially ranked # 3) and

promoted a candidate initially ranked # 4. Id.

### G.     Plaintiff's Demotion

In mid-May 2007, Plaintiff was working a weekend post at Bike Week in Myrtle Beach, and

the area in which she was working was being supervised by Corporal Marsh, who gave her a radio

instruction. McCorkle Aff. ¶ 21. She became highly upset and embarrassed because he holds a lower

rank but gave her an order (as he had been instructed to do by McCorkle). Id.; Gall Affidavit ¶ 70.

-16-

Plaintiff requested a clarification of her status since she was holding rank with no supervisory responsibilities.  McCorkle Aff. ¶ 21

In response, Plaintiff's supervisory command recommended that she be demoted to a position commensurate with her lack of supervisory responsibilities, and they presented documentation to Chief Gall to support their recommendation. Gall Aff. ¶71; McCorkle Aff. ¶ 23.  It had been more than two years since Plaintiff had been removed from supervisory duties and allowed to work in Warrants, without a reduction in rank. Gall Aff. ¶71.  That was supposed to have been a temporary move, just until the City could return her to supervisory duties. Id.  Since the City's efforts to rehabilitate her as a supervisor had failed, it became necessary to move her to a nonsupervisory rank. Id.  All officers ranked Corporal and above in the Myrtle Beach Police Department must be capable of effectively handling supervisory assignments, and Plaintiff could not. Id.  Chief Gall explained to City Manager Tom Leath that his efforts to overcome Plaintiff's supervisory deficiencies and insecurities had failed, that her supervisory performance was detrimental to officers' morale, and that he had run out of options and patience with her conduct. Id.  Consequently, Chief Gall recommended that she be demoted to a position not requiring supervisory responsibility: Patrol Officer First Class.  Id.  Leath approved the action.  Id.

Captain Vella and Chief Gall met with Plaintiff on May 28, 2007, and presented her with a Notice of Personnel Action memorandum that states as follows:

> Pursuant to Article I, Section 10 of the Employee Handbook you are hereby notified that effective Monday, 05-28-07 you are being reduced in rank to Patrol Officer First Class (Grade 21-Step 46).
>
> Your chain of command officers have worked diligently to afford you ample opportunities to develop leadership and supervision skills commensurate with your position/rank as Police Investigator. Your failure to progress to an acceptable level, and your continued resistance and contempt for command officers who are responsible for guiding you and supervising you in an effort to get you into a position to lead officers in this department has left me no option but to remove you from a position with supervisory responsibilities.

-17-

You have demonstrated an extraordinary level of competence in your role in the Street Crimes Unit handling warrants and fugitives; however you have not been able to gain the necessary skills or respect from your subordinates required to lead them as a supervisory officer.

You will remain assigned to the Street Crimes Unit as the warrants/fugitive officer. Pursuant to Article II, Section 10 of the Employee Handbook, you are entitled to appeal this decision. If you have any questions regarding the procedures, please contact my office.

Gall Aff. ¶ 72; Notice of Personnel Action, MB1-000334.

Plaintiff appealed the demotion decision using the City's grievance procedure, and a hearing was held on July 11, 2007. Gall Aff. ¶ 73; Grievance Hearing Transcript. The grievance panel unanimously denied Plaintiff's appeal. Grievance Hearing Transcript pp. 62-63; Gall Aff. ¶ 73. At the time Defendants filed their Motion for Summary Judgment, Plaintiff remained assigned to the Street Crimes Unit-Warrants Section as Patrol Officer First Class. Gall Aff. ¶ 73.

### H.    Charge of Discrimination

On June 11, 2007, Plaintiff filed a Charge of Discrimination with the South Carolina Human Affairs Commission (SCHAC) and the Equal Employment Opportunity Commission (EEOC), raising claims of retaliation, and age and gender discrimination beginning July 1, 2006, and continuing through May 28, 2007. Charge of Discrimination (attached as Exhibit 1 to Thomas Aff.). In her Charge of Discrimination, she complains about the denial of promotions in January of 2007 and March of 2007 and of her demotion on May 28, 2007. Id. She complains that younger, male employees with less experience and education were promoted over her to the rank of Sergeant. Id. Further, she complains that has been subjected to retaliatory treatment ever since 2002, when she reported that a female coworker had complained to her on more than one occasion that she was being sexually harassed by a male coworker. Id.

Plaintiff received a dismissal and notice of right to sue from the EEOC on March 2, 2009. The present action was filed June 1, 2009.

-18-

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324.  Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel

-19-

Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993);

Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

### A.    Age and Gender Discrimination[9]

Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to

hire or to discharge any individual, or otherwise to discriminate against any individual with respect to

his compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1).  The ADEA makes it unlawful

for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against

any individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's age. 29 U.S.C. § 623(a)(1).

In the absence of direct evidence of discrimination, courts apply the burden-shifting framework

set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)[10]

for claims pursuant to both Title VII and the ADEA.   Hill v. Lockheed Martin Logistics Mgmt., Inc.,

354 F.3d 277, 285 (4th Cir.2004).[11]   Under the analysis set forth in McDonnell Douglas, Plaintiff has

---

[9]This discussion is limited to Plaintiff's denial of the two promotions to Sergeant as it does not appear that she is alleging that she was demoted on the basis of age or gender.  Rather, it appears that she alleges that she was demoted only as a result of retaliation.  See Complaint ¶ 16. Additionally, Plaintiff does not address demotion based upon age or gender  in her Response in opposition to Defendants' Motion.

[10]The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

[11]The Supreme Court recently noted that it "has not definitively decided" whether the McDonnell Douglas framework, first developed in the context of Title VII cases, "is appropriate in the ADEA context." Gross v. FBL Financial Services, Inc., --- U.S. ----, 129 S.Ct. 2343, 2349 n.2, 174 L.Ed.2d 119 (2009). In the absence of further direction from the Supreme Court, the undersigned must follow Fourth Circuit precedent, which applies the McDonnell Douglas framework to ADEA claims. See Hill, 354 F.3d at 285; see also Bodkin v. Town of Strasburg,

the initial burden of demonstrating a prima facie case of discrimination. Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002). To prove a prima facie case of discrimination for failure to promote, a plaintiff must prove that (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. Anderson v. Westinghouse Savannah River Company, 406 F.3d 248, 268 (4th Cir.2005).

    If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the Plaintiff's discharge. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

    Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. Reeves, 530 U.S. at 143.

    In the present case, Defendants argue that Plaintiff cannot establish a prima facie case of discrimination in the denial of the promotions in December of 2006 and March of 2007 because she has presented no evidence supporting an inference of gender or age discrimination. However, Plaintiff's burden at this stage is not an onerous one, see Texas Dep't of Community Affairs, 450 U.S. at 253, and the fact that the two promotions for which Plaintiff was denied were awarded to younger, male employees is sufficient to give rise to an inference of discrimination. See Carter v.

_____

2010 WL 2640461 at *4-5 (4th Cir. June 29, 2010) (continuing to apply the McDonnell Douglas framework following the Gross opinion).

<u>Ball</u>, 33 F.3d 450, 458 (4th Cir.1994) (holding that a plaintiff can establish the fourth element of a <u>prima</u> <u>facie</u> case of discrimination by showing that the position was filled by someone outside the protected class). Defendants do not otherwise argue that Plaintiff has failed to establish a <u>prima</u> <u>facie</u> case of age or gender discrimination. Thus, the burden shifts to Defendants to produce a legitimate, non-discriminatory reason for the denial of the promotion.

Defendants assert that Chief Gall filled the December 2006 Sergeant position with DiLorenzo due to the PPRF comments of his first and second level supervisors, Lieutenant Joseph Capp and Sergeant Terry Altman, who both rated Investigator DiLorenzo the highest possible scores in every category (80 points out of a possible 80).[12] Among the comments by DiLorenzo's supervisors were that he was an effective communicator, was articulate, and was a natural leader, but never condescending despite his education and intelligence. DiLorenzo was also well respected by his peers and was able to accept constructive criticism. Because Defendants have produced a legitimate, nondiscriminatory reason for promoting DiLorenzo over Plaintiff, the burden shifts back to Plaintiff to establish that the legitimate reason produced by Defendants is not its true reason, but is pretext for discrimination.

Plaintiff argues that, in choosing a younger, less-qualified male for the position, Defendants ignored the ratings/rankings of the candidates that were assigned by the panel. First, even though Plaintiff was ranked higher that DiLorenzo in the eligibility pool, it is undisputed that the Promotional Process Policy allowed Chief Gall to choose from any of the top three candidates in the pool, and DiLorenzo was one of the top three candidates. It is not clear on what basis Plaintiff claims that DiLorenzo was less qualified. It is undisputed that Plaintiff had worked more years with the Department and she had completed the AOMP and post-graduate degrees. However, "[i]n a suit

---

[12]Plaintiff's performance ratings, in comparison, were 68 out of 80, and 66 out of 80, the lowest among those received by any of the other candidates for the position.

alleging failure to promote, a plaintiff seeking to rebut an employer's reliance on inferior job qualifications cannot simply compare herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination."Hux v. City of Newport News, Va., 451 F.3d 311, 312 (4th Cir. 2006). Furthermore, employers are not required to promote according to or even consider seniority, Id. at 316; EEOC v. Federal Reserve Bank of Richmond, 698 F.2d 633, 670 (4th Cir. ) (where employer did not use seniority as a factor for promotion, plaintiff's seniority over the successful applicant was "of no moment"), rev'd on unrelated grounds sub nom, Cooper v. Federal Reserve Bank of Richmond, 464 U.S. 932 (1984), nor are employers required to promote the applicant who has attained the highest educational level. Anderson, 406 F.3d at 269-70.

Plaintiff also argues that, unlike her, DiLorenzo had never been a supervisor. However, it is well-documented that Plaintiff's supervisory skills were poor. In fact, her supervisory responsibilities were revoked from her in 2006, more than two years prior to the promotion at issue. Although the removal of her supervisory duties was meant to be temporary while she worked at rehabilitating herself, they had yet to be returned due in part to her inability to demonstrate that she had sufficiently improved those skills and in part to her lack of interest in returning to supervisory duties. Lieutenant McCorkle stated in Plaintiff's 2006 Performance Appraisal that "[t]o be promoted to a higher position of authority and span of control of officers, it will take time to reestablish her abilities to supervise."

Furthermore, between the time Plaintiff was placed in the number two position in the eligibility pool December of 2006, when the next Sergeant position became available, Plaintiff had received two oral reprimands and negative comments on her performance evaluation regarding her abilities to get along with coworkers and supervisors.

The Fourth Circuit has stated, "[i]t is not within our authority to dictate the factors that employers must weigh in making a promotion, and we see nothing in Title VII to indicate that

Congress wished to require companies to disregard the successful personal interactions that make for a productive workplace." Hux, 451 F.3d at 318; accord Amirmokri v. Balt. Gas & Elec. Co., 60 F.3d 1126, 1130 (4th Cir. 1995) (affirming summary judgment for the employer); see also Johnson v. Midlands Tech. College Foundation, No. 3:08-803-JFA-PJG, 2009 WL 3063048, at *5 (D.S.C. Sept. 21, 2009) (supervisor selected employee "based on his personal interactions with her, where he found her to be 'courteous, professional, competent and knowledgeable across a broad range of the College's policies and procedures' and that she possessed the 'poise and experience to succeed in the job'"). Plaintiff fails to present sufficient evidence to demonstrate that Defendants' legitimate, non-discriminatory reasons for promoting DiLorenzo over her in the December 2006 are pretext for a discriminatory reason.

Plaintiff was again denied a promotion to Sergeant in March of 2007, when PFC Beatty was promoted over Plaintiff. When the eligibility pool was first established, Plaintiff was listed in the second position while Beatty was listed in the fifth position. Defendants produce legitimate non-discriminatory reasons for promoting Beatty over Plaintiff: her supervisors continued to have concerns over her ability to supervise other officers, as evidenced by the problems that arose when Plaintiff was given the opportunity to prove herself as a supervisor in early 2007. Additionally, no member of Chief Gall's command staff (the four Captains) recommended promoting Plaintiff. They felt she lacked character, integrity, and credibility, she was only out for herself, she did not respect the Department or her commanding officers, she lacked accountability for her actions, she did not have the respect of her co-workers, and with her volatile behavior and demeanor, she would create hostility.

To the contrary, Captain Vella highly recommended Beatty for promotion. Although there was some concern expressed over Beatty's previous request to step down as Investigator due to personal issues, all four Captains recommended Beatty for the Sergeant position over both Plaintiff and Allen

(the fourth ranked individual in the eligibility pool). Chief Gall felt Beatty had addressed his personal issues, that he had taken to heart some earlier criticisms about his attitude, and that he had demonstrated himself as a peer leader, and that he was demonstrating that he could work at a high level of performance.

Plaintiff argues that Chief Gall's reasons for promoting Beatty over Plaintiff are pretextual and unworthy of credence for several reasons:  first, because Beatty was not even eligible to compete for the position of Sergeant, second, because Chief Gall manipulated the Promotional Process Policy to allow him to promote the fifth ranked individual over the second ranked individual, and finally, because she was more qualified for the position than Beatty.

Plaintiff argues that, pursuant to the Promotional Process Policy, Beatty was not eligible to compete for the Sergeant position because of his PFC rank.  The minimum eligibility requirements for the Sergeant position require a candidate to have two years as a Police Investigator before the position closing.  The record reveals that Beatty previously served as an Investigator for the minimum of two years before asking to be demoted due to personal reasons.  Nothing in the policy requires a candidate to be currently serving as an Investigator to meet the minimum requirement.  Nevertheless, Plaintiff argues that Chief Gall's (or anyone else's) assertion that Beatty previously served as an Investigator must be incorrect because it is undisputed that Beatty never held the rank of Corporal and the policy requires an individual to hold the rank of Corporal for at least one year.  However, the record reflects, and it is undisputed by Plaintiff, that Beatty skipped the rank of Corporal and was promoted to investigator in 1998, prior to the 2001 implementation of the Promotional Process Policy and its requirement that an individual serve as Corporal prior to being promoted to Investigator. Furthermore, even if Beatty had not served as an Investigator for the required two years, the policy provides that the Chief of Police may set aside the time in grade requirement whenever he considers such action to be in the best interest of the department.

-25-

Importantly, the law is well settled that it is the employer's prerogative to establish the qualifications for a position, <u>EEOC v. Fed. Reserve Bank of Richmond</u>, 698 F.2d 633, 671 (4th Cir.1983) (holding that an employer has the right to establish the qualifications that are "necessary or preferred" for a position and the plaintiff must show not only that he meets these qualifications to establish a prima facie case but also that he is superior to the selected candidate to establish pretext), rev'd in part on other grounds sub nom., <u>Cooper v. Fed. Reserve Bank of Richmond</u>, 464 U.S. 932, 104 S.Ct. 334, 78 L.Ed.2d 305 (1983), and Plaintiff's opinion that an individual was not qualified is irrelevant.  <u>See</u>, <u>e.g.</u>, <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 960-61 (4th Cir.1996) (emphasizing that a plaintiff's own self-interested assessment of the qualifications for a particular position is irrelevant and that it is the decision maker's assessment that matters).  Plaintiff's opinion that Beatty was not eligible for the Sergeant position is not supported by the record and is insufficient to show that Defendants' reasons for promoting Beatty over Plaintiff are simply pretext for discrimination.

Next, Plaintiff argues that Chief Gall manipulated the Promotional Process Policy to allow him skip over Plaintiff and promote a lower-ranked employee. Plaintiff and Defendants disagree as to how the policy should be interpreted.  Plaintiff argues that, according to the policy, Chief Gall could only choose from the originally ranked top three candidates in the eligibility pool.  She argues that the language of the policy itself shows that this is the correct interpretation.  The Policy provides that "[t]he Chief of Police may choose any of the top three candidates for a vacant position." Gall Dep. Ex. 11, MB1-001544.  Thus, according to Plaintiff, because the first and third candidates listed in the pool had already been chosen for previous promotions, as the second candidate, she was the only one left to fill the third promotion that came available.

Defendants argue that the top three candidates changes as candidates are promoted out of the eligibility pool.  Thus, from the pool at issue here, once the first candidate was promoted, numbers

two, three, and four became the top three candidates. Then, after candidate number three was promoted, numbers two, four and five became the top three candidates. According to this interpretation, Chief Gall was operating within the policy's requirements when he promoted the number five candidate for the third Sergeant position to become available.

Admittedly, the policy language is not entirely clear and lends itself to both interpretations. However, Defendants present evidence that, since the effective date of the Promotional Process Policy, Chief Gall has skipped over numerous individuals listed in an eligibility pool when making promotional decisions and, on at least one occasion in 2004, skipped over the originally ranked number three candidate to promote the originally ranked number four candidate. Conversely, Plaintiff presents insufficient evidence that the policy was meant to be or has been followed according to her interpretation.[13] Thus, Plaintiff's argument that Chief Gall's manipulated the policy is without merit and fails to show that his reasons for promoting Beatty over Plaintiff are pretext for age and gender discrimination.

Additionally, Plaintiff's reliance on Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289 (4th Cir. 2010) is misplaced. Plaintiff argues that, as in Merritt, she "has shown that the employer did not use its policies neutrally and uniformly, but manipulated them to her disadvantage and to the advantage of younger males." Response p. 10. In Merritt, the physical ability or performance test proffered by the employer as its legitimate, nondiscriminatory reason for discharge was based on a

---

[13] Plaintiff argues that once Chief Gall "realized the transparency of his actions [in skipping over Plaintiff to promote Beatty], he apparently decided to change the way he [subsequently] announced and posted the names of candidates in the promotional pool" by listing them in alphabetical order rather than by numerical ranking. Plaintiff's Response p. 11. The undersigned is unclear how this fact lends support to Plaintiff's argument regarding the interpretation of the policy. Furthermore, Defendants note that in the subsequent eligibility pool created by Chief Gall, there were only three qualified candidates and, thus, there was no need to rank them because the policy allows him to choose any of one of them when a position became available. Gildea Reply Aff. ¶ 12.

policy that had "never been memorialized in writing," was belatedly introduced in the course of litigation, and disparately applied to the female plaintiff. Merritt, 601 F.3d at 297-99.  Further, this court has previously noted that the decision in Merritt was based on evidence that the performance test to which the plaintiff was subjected was inconsistently applied to men, and that

> "a pervasive aversion to the idea of female Pickup and Delivery drivers" existed at Old Dominion and that "employees of all ranks, seemed to share a view that women were unfit [for the Pickup and Delivery] position." The court found that the person who fired the plaintiff "harbored discriminatory animus toward women insofar as he was responsible for selectively employing the [performance test] and was part and parcel of Old Dominion's widespread resistance to hiring women as Pickup and Delivery drivers."

Burdine v. Greenville Tech. Coll., No. 6:08-3764-JMC, 2010 WL 5211544, at *7 (D.S.C. Dec. 16, 2010) (quoting and citing Merritt, 601 F.3d at 296-301).  In the present case, Plaintiff has failed to show that the Promotional Process Policy has been inconsistently applied, that there exists any aversion to the idea of females in high ranking positions or that Chief Gall harbored any discriminatory animus towards women.  To the contrary, both of Plaintiff's supervisors, Prock and McCorkle, as well as Administrative Captain Faith Gildea, are examples of females who are older than Plaintiff who Chief Gall has promoted to high ranking positions within the police department.

Finally, Plaintiff's argument that she was better qualified for the position than Beatty fails.  While it is true that she had more experience with the police department and more education than Beatty, as with DiLorenzo, Plaintiff cannot simply compare herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination."Hux v. City of Newport News, Va., 451 F.3d 311, 312 (4th Cir. 2006).  Furthermore, employers are not required to promote according to seniority, id. at 316; Federal Reserve Bank of Richmond, 698 F.2d at 670, or educational level, Anderson, 406 F.3d at 269-70.  An employer may consider both objective and subjective factors in determining whom to select for a position.  See Texas

Dep't of Community Affairs , 450 U.S. at 259 ("[T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability ...."); Amirmokri, 60 F.3d  at 1130 (affirming summary judgment on a failure to promote claim on the basis that even if the plaintiff's education was superior to the selectee's, the employer could properly take into account both the objective factors "and the more subjective factors like his good interpersonal skills and his ability to lead a team").

It is undisputed that Plaintiff suffered from an inability to effectively supervise subordinate employees. The Fourth Circuit has recognized job performance, including lack of supervisory skills, to be a "valid, nondiscriminatory bas[i]s for any adverse employment decision." Evans, 80 F.3d at 960.   In Evans, the court granted summary judgment to the employer on plaintiff's gender discrimination claim for failure to promote because "[t]he company offered substantial evidence that management considered Evans not yet ready for a supervisory position, including the September 1992 performance review indicating that while she was good at her job, Evans had problems with 'moodiness,' [and] Evans's February 1993 reprimands" for "squabbling on the job." Id. at 957, 960. Rather than address her supervisory problems, Plaintiff argues that Defendants "cherry-picked" the negative issues with her job performance and ignored her positive aspects.   Nevertheless, it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff. King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir.2003)(stating that plaintiff's own testimony of satisfactory job performance cannot establish a genuine issue as to whether he was meeting his employer's expectations in a race discrimination case) (citing Evans, 80 F.3d at 960-61).  Furthermore, although Plaintiff submits Affidavits of Sergeant Harry Rogers[14], a former supervisor, and Andy Roberts, a

---

[14]In fact, Rogers states that Plaintiff "perhaps at times did not display good 'people skills,' and seemed to come off strong."  Rogers Aff. ¶ 7.

former subordinate, in which they attest to her ability to work well with and supervise others, the opinions, to the extent they are relevant to the employment decisions made by Chief Gall, do not create an issue of fact.  Id.  Courts do not sit as super personnel departments second guessing an employer's perceptions of an employee's qualifications. Smith v. University of North Carolina, 632 F.2d 316, 345-46 (4th Cir.1980).

In sum, it is Plaintiff's burden ultimately to show that illegal discrimination was the motivating factor in denying her the promotions. It is not necessary for this court to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for Defendants' decision. Hawkins v. Pepsico, 203 F.3 d 274, 279 (4th Cir.2000). "Proof that the employer's proffered reasons are unpersuasive, or even obviously contrived, ... does not necessarily establish that [plaintiff's] proffered reason is correct. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 at 146-47, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "It is not enough to disbelieve the [employer]." Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir.2004). Plaintiff must show a reasonable jury could "believe h[er] explanation of intentional . . . discrimination." Id.  Plaintiff has failed to meet her burden of creating a genuine dispute of material fact as to whether the denial of the two promotions to Sergeant were based on age or gender.  Accordingly, summary judgment is appropriate.

## B.    Retaliation

### 1.    Exhaustion of Administrative Remedies

In her Charge of Discrimination, Plaintiff complains that she has been subjected to retaliatory treatment ever since 2002, when she reported that a female coworker had complained to her that she was being sexually harassed by a male coworker.  In addition, Plaintiff alleges in her Complaint that she received a low performance evaluation and low raise in September of 2007 after filing her EEOC charge.

"Before filing suit under Title VII, a plaintiff must exhaust her administrative remedies by

bringing a charge with the EEOC." <u>Smith v. First Union Nat'l Bank</u>, 202 F.3d 234, 247 (4th Cir.2000); <u>see also</u> 42 U.S.C. § 2000e-5(f)(1). The allegations contained in the administrative charge of discrimination generally limit the scope of any subsequent judicial complaint. <u>King v. Seaboard Coast Line R.R.</u>, 538 F.2d 581, 583 (4th Cir.1976) (stating that a subsequent civil suit "may encompass only the 'discrimination stated in the [EEOC] charge itself or developed in the course of a reasonable investigation of that charge' ") (quoting <u>Equal Employment Opportunity Comm'n v. Gen. Elec.</u>, 532 F.2d 359, 365 (4th Cir.1976)); <u>see also</u> <u>Smith v. First Union Nat'l Bank</u>, 202 F.3d 234, 247 (4th Cir.2000) ("A plaintiff's EEOC charge defines the scope of her subsequent right to institute a civil suit."). Only those claims stated in the initial administrative charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent lawsuit. <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 963 (4th Cir.1996) (affirming the district court's dismissal of some of the plaintiff's claims because they were outside the scope of her original EEOC charge and were therefore time barred).   However, in <u>Jones v. Calvert Group, Ltd.</u>, 551 F.3d 297, 303 (4th Cir.2009), the Fourth Circuit explained that a claim of retaliation for the filing of an EEOC charge does not require the filing of a new charge so long as the retaliation charge is "like or reasonably related to and growing out of such allegations." <u>Id.</u> at 302 (quoting <u>Nealon v. Stone</u>, 958 F.2d 584 (4th Cir.1992)).   Thus, it was not necessary for Plaintiff to file a separate Charge of Discrimination regarding her claim that Defendants retaliated against her for filing the first Charge of Discrimination.

### 2.    Timeliness and Scope of Charge

To pursue a claim under Title VII or the ADEA, a plaintiff must "file a complaint with the EEOC within 180 days of the incident, or within 300 days of the incident if state or local proceedings are initiated." <u>Beall v. Abbott Labs.</u>, 130 F.3d 614, 620 (4th Cir.1997); 42 U.S.C. § 2000e-5(e)(1);

National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Here, Plaintiff filed her complaint through SCHAC and, thus, the 300 day period applies. Plaintiff filed her Charge of Discrimination on June 11, 2007. Therefore, acts that occurred before August 15, 2006 (300 days before June 11, 2007) are time-barred and outside the scope of the Charge.

### 3.     Retaliation Based Upon 2002 Report of Sexual Harassment

Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) she engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985); Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 258 (4th Cir.1998); Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998). If Plaintiff establishes a prima facie case, Defendants can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff has the opportunity to prove that Defendants' legitimate, non-retaliatory reason is pretextual. See Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir.2001).

Defendants first argue rather conclusively that Plaintiff did not engage in protected activity by reporting the alleged sexual harassment of McCorkle because "the timing of [Plaintiff's] report was particularly suspicious given that she had just been counseled about a serious offense."[15]

---

[15]Plaintiff made the report of sexual harassment immediately after being orally counseled by her supervisor for making an arrest outside the City's jurisdiction. Gall Aff. ¶ 29. Gall avers that many believed Plaintiff lodged her allegations simply to deflect attention from her own misconduct. Id. at ¶ 30.

Defendants' Memorandum p. 8. To establish "protected activity" Plaintiff must show he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring. Bigge v. Albertsons, Inc., 894 F.2d 1497, 1503 (11th Cir.1990); see also Ross, 759 F.2d at 355 n. 1 (stating that a Title VII oppositional retaliation claimant need not show that the underlying claim of sexual harassment was in fact meritorious in order to prevail). Here, McCorkle testifies that she told Plaintiff about Altman's behavior, that it could possibly be perceived as sexual in nature and that it made her feel uncomfortable. McCorkle Dep. pp. 130-33. Sufficient evidence exists in the record to demonstrate that Plaintiff had a reasonable belief that sexual harassment was occurring and, thus, to establish that she participated in protected activity by reporting it.

Defendants next argue that Plaintiff fails to show a causal connection between her protected activity in 2002 and the promotion denials or her demotion, which occurred in 2006 and 2007. To meet the causal connection requirement, a plaintiff must show that the adverse action would not have occurred "but for" the protected conduct. Ross v. Communications Satellite Corp., 759 F.2d 355, 365-66 (4th Cir.1985) overruled on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). "A causal relationship [between protected activity and adverse action] requires more than simple coincidence. Causation requires the employer's action be the consequence of the protected activities and of nothing else." Bray v. Tenax Corp., 905 F. Supp. 324, 328 (E.D.N.C. 1995). In her Response, Plaintiff fails to point to any evidence in the record that would show a causal connection between her 2002 report and the adverse employment actions in 2006 and 2007. In fact, she fails to address the causal connection requirement at all other than her vague reference that McCorkle, who Plaintiff alleges recanted her claim of sexual harassment, was later "instrumental" in the decision to demote Plaintiff.

Even if McCorkle's involvement in the sexual harassment claim and Plaintiff's later demotion created an inference of a causal connection, the length of time between the protected activity and the

adverse action actually negates any inference that a causal connection exists between the two.  See

Watson v. Snow, No. Civ. 103CV00394, 2006 WL 753185, *5 (M.D.N.C. March 20, 2006) (holding

that even though the individuals that made the adverse employment decision were the same individuals

named in the plaintiff's EEOC complaint, the passage of twelve months between the protected activity

and the adverse action negated any inference of a causal connection) (citing  Dowe v. Total Action

Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir.1998) (concluding that three-year lapse

was too long for causation to survive)); see also Garrett v. Lujan, 799 F.Supp. 198, 202 (D.D.C.1992)

(concluding that the passage of nearly a year precluded an inference of causal connection); Parrott v.

Cheney, 748 F.Supp. 312 (D.Md.1989) (even the passage of as little as five months between filing

EEOC complaint and adverse action may be enough to negate causal connection in a particular factual

context), aff'd per curiam, 914 F.2d 248 (4th Cir.1990).  Accordingly, Plaintiff fails to establish a

prima facie case of retaliation based upon the 2002 report of sexual harassment and summary judgment

is appropriate on this claim.[16]

### 4.    Retaliation Based Upon 2007 Charge of Discrimination

Plaintiff filed her Charge of Discrimination based upon age and gender discrimination in June

of 2007.  She alleges in her Complaint that Defendants then retaliated against her for filing the Charge

by giving her a low performance evaluation and low raise in September of 2007.  Plaintiff fails to

address this claim at all in her Response to Defendants' Motion.  Thus, the undersigned assumes that

Plaintiff has abandoned this claim.

---

[16]Even if Plaintiff could establish a prima facie case of retaliation, summary judgment is
still appropriate because Defendants have proffered legitimate, non-retaliatory reasons for the
promotion denials and the demotion and Plaintiff has failed to show that those reasons were pretext
for retaliatory reasons.  See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252–53
(1981) (holding that, to show pretext, a plaintiff must prove that but for the protected conduct, the
adverse employment action would not have occurred).  In other words, Plaintiff has failed to
present a genuine dispute of material fact that she would have been promoted or not demoted but
for her report of sexual harassment in 2002.

Even if Plaintiff has not abandoned this claim, she fails to establish a prima facie case of retaliation. Plaintiff fails to point to any evidence in the record that she received a lower than normal raise following her Charge of Discrimination. Furthermore, Defendants argue that a low performance evaluation fails to rise to the level of an adverse employment action. The Supreme Court has clarified that a different and less strenuous standard is used to define adverse employment actions in the retaliation context as opposed to other Title VII contexts: "[T]he anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington Northern & Santa Fe Rwy. v. White, 548 U.S. 53, 64, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). However, the anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Id. at 67 (emphasis added). Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (quotation marks and citations omitted). Courts within the Fourth Circuit have generally found that actions which essentially amount to criticism of an employee such as negative performance evaluations, reprimands or warnings, and counseling are alone insufficient to constitute materially adverse employment actions under the Burlington standard. See Parsons v. Wynne, 221 Fed. Appx. 197 (4th Cir.2007) (unpublished) (negative performance evaluation and change in work schedule); Rease v. Zax, Inc., C/A No. 3:07-3601, 2009 WL 2998977, *7 (D.S.C. Sept.17, 2009) (unpublished) (warning notices and poor performance review); Washington v. Norton, No. 3:04CV 1042007, WL 1417290, *4 (N.D.W.Va. May 11, 2007) (unpublished) (reprimand and warning); Gordon v. Gutierrez, No. 1:06cv861, 2007 WL 30324, *9 (E.D.Va. Jan.4, 2007) (unpublished) (verbal counseling); Zackrie v. Lockheed Martin Corp., No. RWT 04-1864, 2006 WL 2849767, at *8 (D.Md. Oct.2, 2006) (unpublished) (documenting areas for improvement and tracking absences); but see White v. Baxter Healthcare Corp., 533 F.3d 381, 402

-35-

(6th Cir.2008) ("In general, a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary.").

Plaintiff fails to present sufficient evidence to support her allegation that she suffered a materially adverse employment action following her 2007 Charge of Discrimination. Thus, to the extent Plaintiff has not abandoned this claim, summary judgment is appropriate.

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Defendants' Motion for Summary Judgment (Document #40) be granted.

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

July 27, 2011
Florence, South Carolina